UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARK McKINLEY,

                              Plaintiff,

                    -v.-

DETECTIVE KYLE CREVATAS, Shield #24662;
DETECTIVE LOGAN PAYANO, Shield #28;
OFFICER EDGAR GARCIA, Shield #3118;
DETECTIVE SEAN BROWN, Shield #41; and
NYPD UNDERCOVER OFFICER UC 376,

                              Defendants.

---

20 Civ. 3606 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Officers[1] with the New York City Police Department (the "NYPD") arrested Plaintiff Mark McKinley in the lobby of a Manhattan apartment building after an undercover officer observed him participating in what that officer believed to be a drug sale. No drugs were ever recovered, and Plaintiff was never charged with a drug crime. Instead, he was charged with resisting arrest and obstructing government administration based on his conduct during his arrest. After prosecutors dismissed and sealed those charges, Plaintiff brought this action seeking damages for the allegedly unconstitutional actions of the NYPD officers involved in his arrest and subsequent detention. Specifically, he brings claims for false arrest, malicious prosecution, unlawful search, excessive force, denial of a fair trial, and failure to intervene in other officers' unconstitutional

---

[1] While the Court recognizes that Defendants comprise both NYPD police officers and detectives, it uses the term "officers" to refer to them in the aggregate.

conduct.  The officers now move for summary judgment as to each of Plaintiff's claims.  For the reasons that follow, the Court grants in part and denies in part their motion.

**BACKGROUND**[2]

**A.   Factual Background**

**1.   Plaintiff's Arrest**

On the evening of March 27, 2018, NYPD Detectives Sean Brown, Kyle Crevatas, and Logan Payano, NYPD Officer Edgar Garcia, and Undercover Officer No. 376 ("UC 376," and collectively, "Defendants") were assigned to the Manhattan South Narcotics Division and on duty in the vicinity of Manhattan's

---

[2]   The facts set forth in this Opinion are drawn from the parties' submissions in connection with Defendants' motion for summary judgment.  The Court draws primarily from Defendants' Local Civil Rule 56.1 Statement of Material Undisputed Facts (Dkt. #110 ("Def. 56.1")), Plaintiff's Response to Defendants' Local Civil Rule 56.1 Statement and Statement of Additional Material Facts pursuant to Local Civil Rule 56.1(b) (Dkt. #112 ("Pl. 56.1")), and Defendants' Local Civil Rule 56.1 Counterstatement of Material Undisputed Facts (Dkt. #117 ("Def. Reply 56.1")).  Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  In addition, "[e]ach numbered paragraph in the statement of material facts ... will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civil Rule 56.1(c).

The Court sources additional facts from the declarations submitted by the parties and the exhibits attached thereto.  In particular, the Court considers the exhibits attached to the declaration of Andrew B. Spears (Dkt. #108 ("Spears Decl.")), including the transcript of Plaintiff's deposition (Spears Decl., Ex. 1 ("Pl. Dep.")) and the transcript of the deposition of UC 376 (Dkt. #109 ("UC 376 Dep.")); *see also* Spears Decl., Ex. 6)). The Court also considers the exhibits attached to the declaration of Edward Sivin (Dkt. #113 ("Sivin Decl.")), including Plaintiff's declaration (Sivin Decl., Ex. 1 ("Pl. Decl.")), a datasheet prepared by the Manhattan District Attorney's Office (*id.*, Ex. 2 ("DA Datasheet")), and the misdemeanor complaint filed on March 28, 2018 in the Criminal Court of the City of New York, County of New York (*id.*, Ex. 3 ("Crim. Compl.")).  Other facts sourced from the declarations and their accompanying exhibits are cited using the convention "[Name] Decl., Ex. [ ]."

For ease of reference, the Court refers to Defendants' brief in support of their motion for summary judgment as "Def. Br." (Dkt. #111), to Plaintiff's opposition brief as "Pl. Opp." (Dkt. #114), and to Defendants' reply brief as "Def. Reply" (Dkt. #119).

Lower East Side.  (Pl. 56.1 ¶¶ 4-5).  That evening, UC 376 was conducting undercover operations and overheard "a narcotics related conversation" between a man and a woman later identified as Dwayne Roe and Yolanda Brown-Monaco, respectively.  (UC 376 Dep. 16-17).  Thereafter, UC 376 followed Brown-Monaco through a courtyard and into the lobby of an apartment building located at 64 Essex Street, where UC 376 observed her make a phone call.  (Pl. 56.1 ¶ 6; UC 376 Dep. 33).  The parties dispute whether Roe also entered 64 Essex.  (*Compare* UC 376 Dep. 31-32 (recalling that both Brown-Monaco and Roe entered 64 Essex), *with* Pl. Dep. 41-42 (recalling Brown-Monaco's male companion *outside* of the building in the courtyard)).

Plaintiff entered the lobby of 64 Essex around the same time as Brown-Monaco.  (Pl. 56.1 ¶¶ 1, 8).  In Plaintiff's telling, he had taken the elevator from his girlfriend's apartment down to the building lobby, where he paused to smoke a cigarette and wait for a taxi.  (*Id.* ¶¶ 1, 2, 8; *see also* Pl. Dep. 34, 40).  Plaintiff recalls that Brown-Monaco approached him in the lobby doorway and asked for a cigarette.  (Pl. 56.1 ¶ 2).  Plaintiff did not have a cigarette to spare, and instead gave Brown-Monaco fifty cents.  (*Id.* ¶ 3).  UC 376's memory differs.  In his account, it was Plaintiff who approached Brown-Monaco and "appeared to be exchanging small objects" with her.  (UC 376 Dep. 35; *see also* Def. 56.1 ¶ 8).

UC 376 believed the interaction between Plaintiff and Brown-Monaco to be a drug transaction based on (i) overhearing Brown-Monaco and Roe having

a drug-related conversation earlier in the evening; (ii) following them to a building he knew to be the site of frequent drug activity; (iii) observing Brown-Monaco make a phone call; and (iv) watching Plaintiff exit the elevator, approach Brown-Monaco, and exchange small objects with her.  (Def. 56.1 ¶ 9). After witnessing Plaintiff's interaction with Brown-Monaco, UC 376 communicated his suspicion of criminal activity to the Manhattan South Narcotics Division field team, and instructed them to apprehend Plaintiff, Brown-Monaco, and Roe.  (*Id.* ¶ 10).

Detectives Payano and Garcia, who were dressed in plainclothes, arrived at 64 Essex shortly thereafter, observed Plaintiff in the lobby, and endeavored to arrest him.  (Def. 56.1 ¶ 12; Pl. 56.1 ¶ 40).  Plaintiff recalls the officers grabbing him from behind without identifying themselves.  (Pl. 56.1 ¶¶ 39-40). Believing that he was being robbed, Plaintiff started to scream and attempted to free himself by dropping to the floor.  (*Id.* ¶¶ 40-41).  Plaintiff physically struggled with the officers for approximately one minute.  (Def. 56.1 ¶ 15).  He stopped struggling when one of the officers identified himself as police and produced a pair of handcuffs, but continued to scream.  (Pl. 56.1 ¶ 42). Plaintiff testified that after he was handcuffed, one of the officers told him to shut up and kicked him in the face, causing him to sustain a busted lip and a loose tooth.  (*Id.* ¶ 43).  The officers deny kicking Plaintiff.  (Def. Reply 56.1 ¶ 43).

Payano and Garcia conducted a pat-down search of Plaintiff in the lobby of 64 Essex and did not find any contraband as a result.  (Pl. 56.1 ¶¶ 45-46).

Detective Crevatas arrested Brown-Monaco and Roe at the scene, and similarly did not recover contraband from either of them.  (*Id.* ¶¶ 47, 49).

### 2.      Events Following Plaintiff's Arrest

Detective Brown, who was not present for Plaintiff's arrest inside 64 Essex, transported Plaintiff to Police Service Area 4 ("PSA 4") in a prison van. (Def. 56.1 ¶¶ 17, 19).[3]  Brown again searched Plaintiff at the van and again did not recover any contraband.  (Pl. 56.1 ¶ 50).

The parties disagree about what occurred following Plaintiff's arrival at PSA 4.  As Plaintiff recalls, Brown interrogated Plaintiff about where on his body he was hiding drugs.  (Pl. 56.1 ¶ 51).  When Plaintiff responded that he did not have any drugs, Brown cursed at him, forced him to the ground, and performed a cavity search, including touching his genitalia and inserting one or two fingers into his anus.  (*Id.* ¶¶ 52-55).  It is undisputed that no drugs were found on Plaintiff at that time.  (*Id.* ¶ 57).  Brown admits to searching Plaintiff at PSA 4 and admits that at least two other officers were present for that search (Def. 56.1 ¶ 20; Def. Reply 56.1 ¶ 56), but denies Plaintiff's claims regarding the cavity search "insofar as the only evidence cited in support of this purported factual statement is [P]laintiff's own self-serving affidavit" (Def. Reply 56.1 ¶¶ 51-53, 55).

---

[3]      The NYPD's Housing Bureau is organized into Police Service Areas, which are akin to precincts.  PSAs often encompass several precincts; PSA 4, for instance, "serves 23 New York City Housing Authority developments in the 5th, 7th, 9th, and 10th precincts in Manhattan."  *Police Service Area 4*, NEW YORK CITY POLICE DEPARTMENT, https://www.nyc.gov/site/nypd/bureaus/transit-housing/police-service-area-4.page (last visited June 30, 2023).

At some point that evening or early in the morning of March 28, 2018,
Plaintiff requested medical attention and was taken to Bellevue Hospital.  (Def.
56.1 ¶¶ 21-22).  The parties agree that Plaintiff presented at the hospital with
wrist and shoulder pain and was treated with ibuprofen (*id.* ¶ 22), but Plaintiff
asserts that he also suffered from a busted lip, loose teeth, and bruised ribs (Pl.
56.1 ¶ 22).  Doctors cleared Plaintiff for arraignment.  (Def. 56.1 ¶ 23).

Plaintiff was charged with resisting arrest in violation of New York Penal
Law ("NYPL") § 195.05 and obstructing government administration in violation
of NYPL § 205.30.  (Def. 56.1 ¶ 24; *see also* Crim. Compl.).  A Data Sheet from
the Manhattan District Attorney's Office states that UC 376 observed Plaintiff
hand Brown-Monaco a "small white substance" in a "clear package" that "UC
believes ... to be crack."  (DA Datasheet).  Similarly, in a declaration supporting
the criminal complaint, Crevatas attested that UC 376 informed him that
"UC 376 observed [Plaintiff] approach [Brown-Monaco] and hand [her] a
quantity of crack cocaine" and that UC 376's conclusion was "based on his
professional training as a police officer in the identification of drugs and an
observation of the packaging, which is characteristic of this type of drug."
(Crim. Compl.).  Prosecutors dismissed and sealed all charges against Plaintiff
on August 2, 2018.  (Def. 56.1 ¶ 25).

## B.    Procedural Background

The early history of this case is recounted in the Court's June 8, 2022
Opinion and Order.  *McKinley* v. *Crevatas*, No. 20 Civ. 3606 (KPF), 2022 WL
2066195, at *2-3 (S.D.N.Y. June 8, 2022).  (Dkt. #90).  Following that Opinion,

the Court entered the parties' proposed discovery schedule (Dkt. #92), which it extended once upon application of the parties (Dkt. #99).  Fact discovery closed on December 5, 2022.  (*Id.*).

On December 16, 2022, Defendants filed a letter detailing the grounds for their anticipated motion for summary judgment (Dkt. #100), to which Plaintiff responded on December 19, 2022 (Dkt. #101).  The Court dispensed with its usual practice of holding a pre-motion conference and adopted the parties' agreed-upon schedule for briefing the anticipated motion.  (Dkt. #102). The Court also adjourned the scheduled post-fact discovery conference *sine die.*  (*Id.*).  The Court subsequently granted Defendants' request for an extension of the briefing schedule (Dkt. #104), as well as their application to file the transcript of UC 376's deposition under seal (Dkt. #106).

On February 15, 2023, Defendants filed their motion for summary judgment and accompanying papers.  (Dkt. #107-111).  Plaintiff filed his opposition and accompanying papers on March 20, 2023.  (Dkt. #112-114). After receiving a filing extension (Dkt. #116), Defendants filed their reply memorandum of law and accompanying papers on May 4, 2023 (Dkt. #118-119).

## DISCUSSION

### A.    Applicable Law

#### 1.    Summary Judgment Under Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to

7

any material fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); *see also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322
(1986).[4]  A fact is "material" if it "might affect the outcome of the suit under the
governing law," and is genuinely disputed "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."  *Anderson*
v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

While the moving party bears the initial burden of demonstrating "the
absence of a genuine issue of material fact," *Celotex Corp.*, 477 U.S. at 323, the
party opposing summary judgment "must do more than simply show that there
is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus.
Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v.
*Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Rather, the non-moving party
"must set forth specific facts showing that there is a genuine issue for trial."
*Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d
33, 41 (2d Cir. 2006) (citing Fed. R. Civ. P. 56(e)).

When ruling on a summary judgment motion, the district court must
construe the facts in the light most favorable to the non-moving party and
must resolve all ambiguities and draw all reasonable inferences against the

---

[4]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary
judgment standard from a genuine "issue" of material fact to a genuine "dispute" of
material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting
that the amendment to "[s]ubdivision (a) … chang[es] only one word — genuine 'issue'
becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment
determination.").  This Court uses the post-amendment standard, but continues to be
guided by pre-amendment Supreme Court and Second Circuit precedent that refer to
"genuine issues of material fact."

movant.  *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  In considering "what may reasonably be inferred" from evidence in the record, however, the Court should not afford the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts."  *Cnty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990).  Moreover, "[t]hough [the Court] must accept as true the allegations of the party defending against the summary judgment motion, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment."  *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587).

### 2.  Civil Rights Actions Under 42 U.S.C. § 1983 and Qualified Immunity

"[Section 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere."  *City of Oklahoma City* v. *Tuttle*, 471 U.S. 808, 816 (1985).  There are two essential elements to any claim raised under Section 1983: "[i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges."  *Annis* v. *Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).  Furthermore, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983."  *Victory* v. *Pataki,*

814 F.3d 47, 67 (2d Cir. 2016) (quoting *Farrell* v. *Burke*, 449 F.3d 470, 484 (2d Cir. 2006)).

Qualified immunity can foreclose liability under Section 1983.  It is an affirmative defense that protects officials from civil liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow* v. *Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity protects officials from liability unless those officials (i) violated a plaintiff's statutory or constitutional right and (ii) that right was clearly established at the time of the challenged conduct. *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 735 (2011).  The Court has discretion to address those inquiries in either order.  *Pearson* v. *Callahan*, 555 U.S. 223, 236 (2009).

A right is clearly established if "existing law … placed the constitutionality of the officer's conduct 'beyond debate.'" *Dist. of Columbia* v. *Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *al-Kidd*, 563 U.S. at 741).  "In determining whether a right was so clearly established, the Supreme Court has emphasized that the 'dispositive inquiry … is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Barboza* v. *D'Agata*, 676 F. App'x 9, 12 (2d Cir. 2017) (summary order) (emphasis omitted) (quoting *Saucier* v. *Katz*, 533 U.S. 194, 202 (2001)).  Qualified immunity thus protects officers when "their decision was reasonable, even if mistaken." *Johnson* v. *Perry*, 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Hunter* v. *Bryant*, 502 U.S. 224, 229 (1991)); *see also Sabir* v. *Williams*, 37 F.4th 810, 822 (2d Cir. 2022) ("Although the scope of qualified immunity is

considered broad enough to protect 'all but the plainly incompetent or those who knowingly violate the law,' it is not available when an officer's actions are not objectively reasonable in light of clearly established law." (quoting *Ziglar* v. *Abbasi*, 582 U.S. 120, 152 (2017))).

**B.     The Court Grants in Part and Denies in Part Defendants' Motion for Summary Judgment**

Defendants seek summary judgment on each of Plaintiff's claims as to some or all Defendants.  The Court addresses each in turn.  For the reasons that follow, Plaintiff is entitled to a trial on many of his claims.

**1.     The Court Denies Summary Judgment on Plaintiff's False Arrest Claim as to Defendants Crevatas, Payano, and Garcia, and Grants Summary Judgment as to Defendant Brown**

**a.     Applicable Law**

The Fourth Amendment to the U.S. Constitution protects individuals within the United States from false arrest.  *Weyant* v. *Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  A federal false arrest claim is "substantially the same as a claim for false arrest under New York law."  *Id.*  To establish a claim of false arrest under either federal or state law, the plaintiff must prove that: "[i] the defendant intended to confine [plaintiff], [ii] the plaintiff was conscious of the confinement, [iii] the plaintiff did not consent to the confinement, and [iv] the confinement was not otherwise privileged."  *Ackerson* v. *City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (internal quotation marks and citation omitted).  The existence of probable cause for an arrest privileges confinement, and thus is a complete defense to a false arrest claim.  *Id*; *see also Figueroa* v. *Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) ("The existence of probable cause to arrest —

11

even for a crime other than the one identified by the arresting officer — will defeat a claim of false arrest[.]" (citing *Devenpeck* v. *Alford*, 543 U.S. 146, 152-54 (2004))).

Probable cause requires an officer to have "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Martinez* v. *Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citation omitted). It is "a fluid concept" assessed in consideration of the totality of the circumstances, and thus is "not readily, or even usefully, reduced to a neat set of legal rules." *Caldarola* v. *Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) (internal quotation omitted). "Probable cause does not require absolute certainty" that a crime occurred. *Boyd* v. *City of New York*, 336 F.3d 72, 76 (2d Cir. 2003); *see also Zalaski* v. *City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013) (explaining that probable cause does not "demand that an officer's good-faith belief that a suspect has committed or is committing a crime be correct or more likely true than false" (quotation omitted)). "Rather, it requires only facts establishing 'the kind of fair probability' on which a 'reasonable and prudent' person, as opposed to a 'legal technician,' would rely." *Figueroa*, 825 F.3d at 99 (quoting *Florida* v. *Harris*, 568 U.S. 237, 243-44 (2013) (alterations adopted)).

Probable cause is assessed with reference to the facts available to the officer before and during the arrest. *Panetta* v. *Crowley*, 460 F.3d 388, 395 (2d Cir. 2006). "The fact that an innocent explanation may be consistent with the facts alleged … does not negate probable cause." *Id.* (quoting *United States* v.

*Fama*, 758 F.2d 834, 838 (2d Cir. 1985)).  Thus, where there are two conflicting explanations for conduct — one innocent and another not so — the officer may credit the latter and conclude that a crime is afoot.  *See, e.g.*, *id.* at 396-98 (finding probable cause for animal neglect arrest despite officer's decision not to heed defendant's assertions that the horse was under a veterinarian's care). An officer may not, however, disregard evidence that is plainly exculpatory. *See Kerman* v. *City of New York*, 261 F.3d 229, 241 (2d Cir. 2001) (citing *Kuehl* v. *Burtis,* 173 F.3d 646, 650 (8th Cir. 1999)).

As a general matter, police officers are "entitled to rely on the allegations of fellow police officers" in making a probable cause determination.  *Martinez*, 202 F.3d at 634; *see also United States* v. *Colon*, 250 F.3d 130, 135 (2d Cir. 2001) ("Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation.").  An officer may not, however, rely on another officer's statements when he harbors significant doubts about the credibility of those statements.  *Loria* v. *Gorman*, 306 F.3d 1271, 1288 (2d Cir. 2002).  "[T]he determination of probable cause does not turn on whether [the fellow agent's] observations were accurate, but on whether [the arresting agent] was reasonable in relying on those observations." *Bernard* v. *United States,* 25 F.3d 98, 103 (2d Cir. 1994).

"Probable cause is a mixed question of law and fact[.]"  *Dufort* v. *City of New York*, 874 F.3d 338, 348 (2d Cir. 2017) (citation omitted).  Generally speaking, "[q]uestions of historical fact regarding the officers' knowledge at the time of arrest are to be resolved by the jury."  *Id.* (citation omitted).  "However, 'where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court.'"  *Id.*  (quoting *Walczyk* v. *Rio*, 496 F.3d 139, 157 (2d Cir. 2007)).

Like the existence of probable cause, qualified immunity is a defense to a claim of false arrest.  *Simpson* v. *City of New York*, 793 F.3d 259, 265 (2d Cir. 2015).  "An officer is entitled to qualified immunity ... if he can establish that he had arguable probable cause to arrest the plaintiff."  *Garcia* v. *Does*, 779 F.3d 84, 92 (2d Cir. 2015) (internal quotation marks and citations omitted).  To establish arguable probable cause, the arresting officer must demonstrate that "[i] it was objectively reasonable for the officer to believe that probable cause existed, or [ii] officers of reasonable competence could disagree on whether the probable cause test was met."  *Id.*; *see also Jenkins* v. *City of New York*, 487 F.3d 76, 87 (2d Cir. 2007) ("The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed.").  Because arguable probable cause is a lower bar than actual probable cause, "an officer who cannot establish *arguable* probable cause necessarily cannot establish probable cause."  *Tomkins* v. *City of New York*, 50 F. Supp. 3d 426, 435 (S.D.N.Y. 2014).

      **b.**     **Whether Defendants Crevatas, Payano, and Garcia Had Probable Cause to Arrest Plaintiff for Possession of a Controlled Substance Depends on Disputed Facts**

As explained, Defendants are entitled to summary judgment on Plaintiff's false arrest claim if they had actual or arguable probable cause to arrest him. Plaintiff concedes that summary judgment is appropriate as to Brown, who was not personally involved in his arrest (Pl. Opp. 1), and pursues his false arrest claim only as to Defendants UC 376, Crevatas, Payano, and Garcia.  In the first instance, Crevatas, Payano, and Garcia argue that they had probable cause to arrest Plaintiff for criminal possession of a controlled substance in the fifth degree based on the information they received from UC 376.  (Def. Br. 7-8).  In the alternative, they posit that even if they did not have probable cause to arrest Plaintiff for the drug crime, they developed probable cause to arrest him for obstructing governmental administration when he physically resisted their attempts to arrest him.  (*Id.* at 9-10).  Plaintiff maintains that fact issues preclude summary judgment on both theories.  (Pl. Opp. 10-13).

Importantly, UC 376 does not move for summary judgment on the false arrest claim.  That was a wise decision, as fact issues preclude a ruling in his favor at this stage in the litigation.  The Court pauses to explain why, as this understanding is necessary to evaluating the other officers' theories of the case. A person is guilty of criminal possession of a controlled substance in the fifth degree when he "knowingly and unlawfully possesses … a controlled substance with intent to sell it."  NYPL § 220.06.  An officer's observation of a drug sale can establish probable cause for criminal possession, *see Smith* v. *City of New*

*York*, No. 04 Civ. 3286 (TPG), 2010 WL 3397683, at *8 (S.D.N.Y. Aug. 27, 2010), and UC 376 maintains that he observed Plaintiff and Brown-Monaco exchange "small objects" in what appeared to be a drug sale (UC 376 Dep. 35). But taking Plaintiff's version of events as true, as the Court must at this stage of the litigation, *1-800 Beargram Co.*, 373 F.3d at 244, no such exchange took place, and thus none could have been observed by UC 376. As Plaintiff tells it, all that UC 376 could have observed is Plaintiff handing fifty cents to Brown-Monaco, who gave him nothing in return. (Pl. 56.1 ¶ 3; *see also* Pl. Decl. ¶ 2 ("The woman I gave the 50 cents to did not hand anything back to me.")).

The dispute over whether an exchange took place between Plaintiff and Brown-Monaco precludes summary judgment. Without undisputed facts to support UC 376's account, UC 376's suspicion was based solely on his observation of Plaintiff interacting with Brown-Monaco in a building he believed to be a hot-bed of drug activity after overhearing Brown-Monaco have a drug-related conversation with someone else. (Def. 56.1 ¶ 9). "[A] seconds-long interaction with someone who possessed drugs … is plainly insufficient to establish probable cause to arrest." *Taylor* v. *City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *9 (S.D.N.Y. Mar. 11, 2022); *see also Perez* v. *Duran*, 962 F. Supp. 2d 533, 538 (S.D.N.Y. 2013) ("Physical proximity to criminal behavior without more is insufficient to establish probable cause."). "This is true even when a person is arrested at a location known for drug sales[.]" *Burgess* v. *City of New York*, No. 15 Civ. 5525 (RRM) (VMS), 2018 WL 1581971, at *3 (E.D.N.Y. Mar. 29, 2018). To that end, courts routinely deem

16

probable cause in drug cases to be a fact issue when the occurrence of an exchange between an arrestee and third party is disputed.  *See, e.g., Perez*, 962 F. Supp. 2d at 539 (denying summary judgment where officer testified to witnessing a drug purchase but arrestee averred that he merely shook hands with third party); *Burgess*, 2018 WL 1581971, at *3-4 (same).  The existence of UC 376's probable cause turns on whether he witnessed an exchange between Plaintiff and Brown-Monaco, a factual determination that will ultimately be the province of a jury.

With this background in mind, the Court turns to the central inquiry, which is whether Defendants Crevatas, Payano, and Garcia are entitled to qualified immunity on Plaintiff's false arrest claim.  Although they effectuated Plaintiff's arrest, Crevatas, Payano, and Garcia were not involved in the initial probable cause determination.  They argue that under the fellow-officer rule, they were entitled to rely on UC 376's determination that probable cause supported Plaintiff's arrest for criminal possession of a controlled substance. (Def. Br. 7-8).  More specifically, they assert that they had at least arguable probable cause to arrest Plaintiff based on UC 376 telling them "that he had just observed [P]laintiff possess and hand over suspected narcotics to a non-party [B]lack female[.]"  (*Id.* at 8).

Were this account of what occurred undisputed, the officers would have a stronger case.  *See Loria*, 306 F.3d at 1288 ("Absent significant indications to the contrary, an officer is entitled to rely on his fellow officer's determination that an arrest was lawful.").  But their framing is not borne out by the record.

In particular, the Court does not know what UC 376 told Crevatas, Payano, and Garcia that prompted them to arrest Plaintiff.  At his deposition, UC 376 stated multiple times that he did not know what he told the officers.  (*See, e.g.*, UC 376 Dep. 50:4-6 ("[D]id you tell [the field team] the reason why these three individuals should be apprehended?"  I don't recall."); *id.* at 51:6-7 ("I'm not sure what I said to them.")).  At another point, he stated that he "described [Plaintiff, Brown-Monaco, and Roe] and told the [field team] what happened[.]" (*Id.* at 50-51).  And the parties agree only that UC 376 told the officers "what he had observed" (Pl. 56.1 ¶ 10), with the specifics of those conversations and observations hotly disputed.

Of course, an arrest can be lawful even if the arresting officer "lacks the specific information to form the basis for probable cause or reasonable suspicion," so long as "sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation."  *Colon*, 250 F.3d at 135.  In other words, an officer is constitutionally permitted to effectuate an arrest based on the observations of another officer if the observing officer had probable cause.  As such, "the 'fellow officer' rule is typically invoked in cases where the record is clear as to what the officer seeking backup reported."  *Jackson* v. *City of New York*, 939 F. Supp. 2d 235, 256 (E.D.N.Y. 2013) (citing, *e.g.*, *Martinez*, 202 F.3d at 635).  Not so here.  The arresting officers' theory of probable cause suffers from the same fatal flaw as UC 376's would have, had it been argued: It depends on UC 376 observing a drug exchange between Plaintiff and Brown-Monaco, or at least

credibly describing such an exchange to Crevatas, Payano, and Garcia.  Just as a jury will have to decide what UC 376 witnessed, it will also have to decide what he reported to the field team.[5]  Absent agreement between the parties on those details, the Court cannot grant summary judgment to the officers on this point.  *See id.* at 256-57 (determining that fellow-officer rule did not apply where "no evidence has clarified what, if anything, [observing officer] reported" to arresting officers).

### c.   Whether Defendants Payano and Garcia Had Probable Cause to Arrest Plaintiff for Obstructing Governmental Administration Depends on Disputed Facts

Unable to conclude as a matter of law that the officers had probable cause to arrest Plaintiff for drug possession, the Court considers whether Payano and Garcia had probable cause to arrest him for the separate crimes of resisting arrest and obstructing governmental administration.  A person is guilty of obstructing governmental administration when he "intentionally obstructs impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act."  NYPL § 195.05.  The offense has four elements: "[i] prevention or attempt to prevent [ii] a public servant from performing [iii] an official function [iv] by means of intimidation, force or

---

[5]      Because the Court finds that fact issues preclude summary judgment for Defendants on this issue, it does not reach Plaintiff's request for an adverse inference based on Defendants' failure to produce recordings from UC 376's hidden recording device.  (*See* Pl. Opp. 9, 19).  Plaintiff may renew his argument as a motion *in limine* prior to trial, if appropriate.

interference." *Cameron* v. *City of New York*, 598 F.3d 50, 68 (2d Cir. 2010). Payano and Garcia argue that they had probable cause to arrest Plaintiff for obstructing governmental administration based on his screams and minute-long attempt to free himself when the officers first grabbed him and attempted to handcuff him (Def. Br. 9), as well as his continued screaming after Payano and Garcia identified themselves as police officers (Def. Reply 5).

The officers' latter theory is easily disposed of. It has long been settled under New York law that the "force or interference" requirement of obstructing governmental administration requires *physical* interference, however minimal. *See Kass* v. *City of New York*, 864 F.3d 200, 209-10 (2d Cir. 2017); *see also Basinski* v. *City of New York*, 706 F. App'x 693, 698 (2d Cir. 2017) (summary order) ("New York courts … have construed 'physical interference' broadly" to include "inappropriate and disruptive conduct at the scene of the performance of an official function[.]" (internal quotations omitted)). Because of this physicality requirement, "words alone, even abusive ones, cannot give rise to probable cause to arrest for obstructing government administration as a matter of law." *Grytsyk* v. *Morales*, 527 F. Supp. 3d 639, 648 (S.D.N.Y. 2021) (internal quotation omitted); *see also In re Davan L.*, 91 N.Y.2d 88, 91 (1997) ("[P]urely verbal interference may not satisfy the 'physical' component under [Section 220.06].")*; accord People* v. *Case,* 42 N.Y.2d 98, 102 (1977) (collecting cases). It is no surprise, then, that Defendants can muster no authority for the idea that "[P]laintiff's refusal to cease screaming after [the officers] identified themselves as police officers amounted to a continued obstruction" of the officers' attempts

to arrest him.  (*See* Def. Reply 5).  This theory is foreclosed by law: Plaintiff's screams at the officers, without more, cannot justify an arrest for obstruction.

The officers' probable cause thus turns on whether Plaintiff's initial physical and verbal resistance to arrest supplied them with at least arguable probable cause to arrest him for obstructing governmental administration. This argument is stronger, as physically struggling against arrest can satisfy the statute's physicality requirement.  *See Kass*, 864 F.3d at 209-10.  Plaintiff admits to physically struggling with Payano and Garcia for approximately one minute when they first grabbed him from behind, including by dropping to the ground.  (Pl. 56.1 ¶¶ 39-41; Def. 56.1 ¶ 15).  But he argues that his resistance was clearly justified under the circumstances and points out that he stopped struggling once the officers identified themselves.  (Pl. Br. 11-12).

Plaintiff's argument is persuasive: A reasonable jury could find that the officers lacked probable cause to believe that Plaintiff resisted arrest.  "In New York, a person may be guilty of resisting arrest only if she is aware that she is being arrested."  *Lowth* v. *Town of Cheektowaga*, 82 F.3d 563, 572 (2d Cir. 1996) (citing *People* v. *Saitta,* 434 N.Y.S.2d 719, 720 (2d Dep't 1981)); *see also United States* v. *Heliczer*, 373 F.2d 241, 248 (2d Cir. 1967) ("[A] person being arrested … who has no actual knowledge that he is being arrested and the circumstances are such as to afford him no reasonable ground to suppose that he is being arrested … has a right to use reasonable force to defend himself.").  It is undisputed that the arresting officers were dressed in plainclothes and did not initially display "police insignia or equipment" to Plaintiff.  (Def. Reply 56.1

¶¶ 38, 40).  Nor is it disputed that Plaintiff thought he was being robbed when the officers first grabbed him.  (*Id.* ¶ 40).  The parties disagree, however, about when the officers identified themselves as such; Plaintiff maintains that the officers did not announce themselves or bring out handcuffs until their physical struggle was underway (Pl. 56.1 ¶¶ 39-42), while the officers aver that they identified themselves prior to placing Plaintiff under arrest (Def. Reply 56.1 ¶ 39).

This dispute is material.  Crediting Plaintiff's version of events, a jury could find that he was not aware that he was being arrested and therefore was entitled to reasonably defend himself.  *See Williams* v. *City of New York,* No. 05 Civ. 10230 (SAS), 2007 WL 2214390, at *10 (S.D.N.Y. July 26, 2009) (determining that probable cause was a fact issue in part because arrestee "contends he was unaware that the men were police officers because the[y] were dressed in plain clothes and failed to show [him] any form of police identification"); *Hamlett* v. *Town of Greenburgh,* No. 05 Civ. 3215 (MDF), 2007 WL 119291, at *5 (S.D.N.Y. Jan. 17, 2007) (denying summary judgment on false arrest claim where there was a disputed fact over whether the officer failed to identify himself to plaintiff as a police officer, because it was "material to the issue of whether [the officer] acted reasonably in believing that he had probable cause to arrest Plaintiff"); *Sutton* v. *Duguid,* No. 05 Civ. 1215 (JFB), 2007 WL 1456222, at *8 (E.D.N.Y. May 16, 2007) ("If a jury credits plaintiff's version of the events — that defendants were not wearing police shields and defendants never announced themselves as police officers in such a way that

would reasonably put plaintiff on notice that they were officers — then a reasonable jury could find that defendants lacked probable cause to believe that plaintiff resisted arrest[.]").  In short, if Plaintiff was resisting a perceived attack rather than a perceived arrest, the officers had no cause to arrest him.

For the same reason, the officers are not entitled to qualified immunity on this claim.  Specifically, if Plaintiff's version is fully credited — namely, that the officers were dressed in plainclothes, did not verbally identify themselves as police officers, and did nothing to indicate to Plaintiff that they were police officers until a minute into their struggle, at which point Plaintiff stopped physically resisting — then it would be objectively unreasonable for the officers to believe they had probable cause based upon Plaintiff's reaction to them.  *See Sutton*, 2007 WL 1456222, at *9 (holding the same and citing *McClellan* v. *Smith*, 493 F.3d 137, 147-49 (2d Cir. 2006)).  Plaintiff's false arrest claim can proceed to trial.

### 2. The Court Denies Summary Judgment on Plaintiff's Malicious Prosecution Claim as to Defendants Crevatas, Payano, and Garcia and Grants Summary Judgment as to Defendant Brown

#### a. Applicable Law

To prevail on a claim for malicious prosecution under Section 1983, a plaintiff must demonstrate both (i) a Fourth Amendment violation and (ii) the common-law elements of the tort of malicious prosecution.  *See Mitchell* v. *City of New York*, 841 F.3d 72, 79 (2d Cir. 2016).  In turn, New York law requires the plaintiff to demonstrate that "[i] the defendant initiated a prosecution against plaintiff, [ii] without probable cause to believe the proceeding can

succeed, [iii] the proceeding was begun with malice, and [iv] the matter terminated in plaintiff's favor." *Rentas* v. *Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (alterations adopted). To establish the constitutional element, the plaintiff must also show "[v] a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman* v. *N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).

Because the lack of probable cause is a necessary element of a malicious prosecution claim, the existence of probable cause can be a complete defense. *See Savino* v. *City of New York*, 331 F.3d 63, 72 (2d Cir. 2003); *accord Kee* v. *City of New York*, 12 F.4th 150, 166 (2d Cir. 2021). Of note, "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Stansbury* v. *Wertman*, 721 F.3d 84, 95 (2d Cir. 2013) (citation omitted). "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd* v. *City of New York*, 336 F.3d 72, 76 (2d Cir. 2003); *see also Posr* v. *Ct. Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999) ("The defendants seem to conflate probable cause to arrest with probable cause to believe that [the charged individual] could be successfully prosecuted. Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim[.]").

To determine whether sufficient probable cause exists to defeat a malicious prosecution claim, a court must separately analyze each "charge … claimed to have been maliciously prosecuted." *Morris* v. *Silvestre*, 604 F. App'x

22, 25 (2d Cir. 2015) (summary order) (quoting *Posr*, 944 F.2d at 100); *see also D'Angelo* v. *Kirschner*, 288 F. App'x 724, 726-27 (2d Cir. 2008) (summary order) ("[A] finding of probable cause to arrest as to one charge does not necessarily defeat a claim of malicious prosecution as to other criminal charges[.]").

### b.   Analysis

Following his arrest, Plaintiff was charged with resisting arrest and obstructing government administration.  (Def. 56.1 ¶ 24).  These charges were dropped and the records sealed a few months later.  (*Id.* ¶ 25).  Because the prosecution history is undisputed, Defendants accept that Crevatas, Payano, and Garcia were personally involved in initiating Plaintiff's prosecution and that the proceeding ended in Plaintiff's favor.  (Def. Br. 10).[6]  The officers instead seek summary judgment on the ground that Plaintiff's arrest for resisting arrest and obstructing government administration was supported by probable cause.  (*Id.*).[7]  Implicit in this argument is the assumption that

---

[6]   Defendants do, however, assert that Brown played no role in Plaintiff's prosecution. (Def. Br. 10-11).  Plaintiff concedes this point (Pl. Opp. 1), and accordingly the Court grants summary judgment to Brown on the malicious prosecution claim.

[7]   Defendants neither concede nor seek summary judgment on the malice element of Plaintiff's malicious prosecution claim.  "Under New York law, malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'"  *Lowth* v. *Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Nardelli* v. *Stamberg*, 44 N.Y.2d 500, 502-03 (1978)).  "[A] lack of probable cause generally creates an inference of malice."  *Manganiello* v. *City of New York*, 612 F.3d 149, 163 (2d Cir. 2010); *see also Ricciuti* v. *N.Y.C. Transit Auth.*, 124 F.3d 123, 131 (2d Cir. 1997) ("[L]ack of probable cause generally raises an inference of malice sufficient to withstand summary judgment.").  Here, the officers' malicious intent is likely a fact issue based on the parties' dispute over the facts giving rise (or not) to probable cause.

probable cause to arrest necessarily translates to probable cause to prosecute.

Even accepting that premise, the Court has already concluded that whether the

officers had probable cause to arrest Plaintiff depends on factual

determinations that cannot be resolved at this stage of the litigation.  *See supra*

Section B.1.b.  As such, Plaintiff's malicious prosecution claim against

Crevatas, Payano, and Garcia survives summary judgment.

> **3.  The Court Denies Summary Judgment on Plaintiff's Claim
> That He Was Denied the Right to a Fair Trial as to Defendants
> UC 367, Crevatas, Payano, and Garcia**

> **a.  Applicable Law**

Recognizing that "[n]o arrest, no matter how lawful or objectively

reasonable, gives an arresting officer or his fellow officers license to deliberately

manufacture false evidence against an arrestee," the Due Process Clause of the

Fourteenth Amendment grants criminal defendants a right to be free from

prosecution based on false evidence.  *Ricciuti* v. *N.Y.C. Transit Auth.*, 124 F.3d

123, 130 (2d Cir. 1997); *see also Barnes* v. *City of New York*, 68 F.4th 123,

128-29 (2d Cir. 2023) (clarifying that this right stems from the Fourteenth,

rather than Sixth, Amendment).  The denial of this right is cognizable under

Section 1983 "if an [i] investigating official [ii] fabricates evidence [iii] that is

likely to influence a jury's decision, [iv] forwards that information to

prosecutors, and [v] the plaintiff suffers a deprivation of liberty as a result."

*Jovanovic* v. *City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary

---

Defendants also do not discuss the liberty element of malicious prosecution,
presumably because they do not contest that Plaintiff's post-arrest detention satisfies
this requirement.

order); *see also Ricciuti*, 124 F.3d at 130 ("When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.").  Fabricated evidence can include an officer's own (false) account of his or her observations of alleged criminal activity, *Garnett* v. *Undercover Officer C0039*, 838 F.3d 265, 274 (2d Cir. 2016), including statements made in a criminal charging instrument, *Ashley* v. *City of New York*, 992 F.3d 128, 138 (2d Cir. 2021).

### b.    Analysis

Plaintiff's denial of a fair trial claim is premised on his contention that Defendants UC 376, Crevatas, Payano, and Garcia included false statements in two of his charging documents.  More specifically, he asserts that the officers falsely reported to prosecutors that UC 376 observed Plaintiff hand Brown-Monaco crack cocaine (*see* DA Datasheet (documenting UC 376's observation that Plaintiff handed Brown-Monaco a "small white substance" in a "clear package" which "UC believes … to be crack"); Crim. Compl. 1 (noting that "UC 376 observed Plaintiff approach [Brown-Monaco] and hand [her] a quantity of crack cocaine")), and that Garcia and Payano identified themselves as NYPD officers *before* attempting to handcuff Plaintiff (Crim. Compl. 1-2), and thereby deprived him of a fair trial.  (Pl. Opp. 14-15).

The affected officers do not deny the existence of these statements in the charging documents, nor do they deny their personal involvement in making

them.  Instead, they believe themselves entitled to summary judgment on this claim because (i) Plaintiff's evidence is insufficient to create a fact issue; (ii) false evidence about a drug crime could not have influenced a jury's views on the resisting arrest charge; (iii) any deprivation of liberty Plaintiff suffered was the result of the resisting arrest charge; and, finally, (iv) Plaintiff's charges were supported by probable cause.  (Def. Br. 12-13).

The Court begins with Defendants' first and last theories, both of which are flawed.  On the first point, Plaintiff met his burden of providing non-conclusory allegations that the officers fabricated their testimony about witnessing a drug sale and identifying themselves.  A jury is entitled to credit Plaintiff's detailed testimony about what happened on the evening of March 27, 2018.  And if it did, it could infer from the inconsistencies between Plaintiff's testimony and the officers' written statements that Defendants knowingly made false representations in the charging documents.  *See Frost* v. *N.Y.C. Police Dep't*, 980 F.3d 231, 245 (2d Cir. 2020) (determining that district court erred by discrediting plaintiff's testimony regarding falsified evidence at summary judgment stage); *see also Rodriguez* v. *City of New York*, 291 F. Supp. 3d 396, 414-15 (S.D.N.Y. 2018) (holding that plaintiff's and officers' conflicting accounts of the events underlying charges created a fact issue as to falsity).  Contrary to Defendants' assertion, these discrepancies are more than "minor inconsistencies" that the Court might reasonably overlook.  (*See* Def. Reply 6).  Whether UC 376 saw Plaintiff holding drugs and whether the officers identified themselves to Plaintiff prior to arresting him speak to issues at the very heart

of this litigation.  *Cf. Keyes* v. *City of New York*, No. 21-2406, 2023 WL 176956,

at *3 (2d Cir. Jan. 13, 2023) (summary order) (determining that minor

inconsistencies in officers' testimony did not preclude grant of summary

judgment to officers on false arrest claims because the officers were consistent

in their "core observations").  The truth or falsity of the challenged statements

is a genuinely disputed issue of fact.

Next, the existence of probable cause is irrelevant to this claim.  Because

a lack of probable cause to arrest or prosecute is not a necessary element of a

fabricated evidence claim, the existence of probable cause does not defeat such

a claim.  *Jovanovic*, 486 F. App'x at 152 ("Probable cause is not a defense.");

*Garnett*, 838 F.3d at 277-78 ("In short, a Section 1983 claim for the denial of a

right to a fair trial based on an officer's provision of false information to

prosecutors can stand even if the officer had probable cause to arrest the

Section 1983 plaintiff.").  The Second Circuit has "repeatedly rejected the effort

to import probable cause into the due process analysis," *Barnes*, 68 F.4th at

132, and this Court continues that tradition today.

Defendants' remaining two arguments — that Plaintiff cannot show that

the allegedly false evidence could influence a jury or work an independent

deprivation of liberty — require more in-depth analysis.  Defendants' theory on

both elements is essentially the same: because Plaintiff was only ever charged

with resisting arrest and obstructing governmental administration, false

statements about his involvement in a drug crime could not have contributed

to his prosecution or influenced a jury.  (*See* Def. Br. 12-13).  Even accepting

Defendants' premise, they would not be entitled to summary judgment on the factual record before the Court.  That is because the allegedly fabricated evidence does not solely relate to the drug crime; Plaintiff also alleges that Defendants lied about when they identified themselves to him during the course of his arrest.  *That* allegedly false evidence directly relates to the crimes with which Plaintiff was ultimately charged.  At minimum, then, Plaintiff's fair trial claim must survive as to the officers' statements about the timing of their self-identification.

Defendants' theory is legally flawed as well.  The bright-line rule that they urge — that false evidence about one charge cannot support a fair trial claim if the plaintiff is not ultimately prosecuted for that crime — is inconsistent with controlling law.  Focusing first on the jury argument, the Court observes that the officers' statements about Plaintiff's participation in a drug sale could have impacted the prosecutors' decision to charge him with resisting arrest.  After all, a jury could find it more likely that Plaintiff resisted arrest if it heard that Plaintiff had engaged in a drug sale just minutes before officers confronted him.  *See Fowler-Washington* v. *City of New York*, No. 19 Civ. 6590 (KAM) (RER), 2023 WL 2390538, at *10 (E.D.N.Y. Mar. 7, 2023) ("[T]here is at least a material dispute as to whether Plaintiff would have been charged at all with resisting arrest, absent the purported fabrication of evidence.  That is, a reasonable jury could at least find that Defendants would not have subjected Plaintiff to criminal prosecution [for resisting arrest], had Plaintiff's only offense been the plain possession of marijuana.").  In other

words, the "prosecutor's decision to pursue charges rather than to dismiss [a] complaint without further action[ ] may depend on the prosecutor's . . . assessment[ ] of the strength of the case, which in turn may be critically influenced by fabricated evidence." *Garnett*, 838 F.3d at 277.  In short, context matters.  The officers' false statements about the drug crime are not as attenuated from the obstruction crime as Defendants make them out to be, because they could have contributed to Plaintiff's prosecution for that separate crime.

Similarly, with respect to the liberty element, it is of no moment that Plaintiff was not ultimately charged with or tried on the drug crime.  A fabricated evidence claim may be sustained even where charges are dismissed before trial.  *See Ricciuti*, 124 F.3d at 130 (reversing summary judgment on denial of fair trial claim for charges dismissed before trial).  That is because "the prosecution of an individual based on fabricated evidence may itself constitute a deprivation of liberty for purposes of the due process right to a fair trial." *Barnes*, 68 F.4th at 126.  Whether the false evidence is ultimately presented to a jury is also not material, "because the forwarding of the evidence may have resulted in the liberty-depriving occurrence of [the] prosecution." *Id.* at 30 (quoting *Ashley*, 992 F.3d at 139); *see also Frost*, 980 F.3d at 250 (explaining that the "fair trial right protects against deprivation of liberty that results when a police officer fabricates and forwards evidence to a prosecutor that would be likely to influence a jury's decision, *were that evidence presented to the jury*," and, further, that this right is distinct "from the separate, although

31

related, right not to be convicted based on the use of false evidence *at trial*"
(emphases in original)).  Plaintiff's claim for denial of his right to a fair trial
survives summary judgment as to Defendants UC 376, Crevatas, Payano, and
Garcia.

> ### 4. The Court Denies Summary Judgment on All Three of Plaintiff's Unlawful Search Claims as to Defendants Payano, Garcia, and Brown

> #### a. Applicable Law

The Fourth Amendment to the Constitution of the United States
provides, in relevant part, that "[t]he right of the people to be secure in their
persons, houses, papers, and effects, against unreasonable searches and
seizures, shall not be violated[.]"  U.S. Const. amend. IV.  "As the text makes
clear, 'the ultimate touchstone of the Fourth Amendment is reasonableness.'"
*Riley* v. *California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City* v. *Stuart*,
547 U.S. 398, 403 (2006)).  "It is well established that a warrantless search is
'*per se* unreasonable under the Fourth Amendment — subject only to a few
specifically established and well-delineated exceptions.'"  *United States* v. *Diaz*,
122 F. Supp. 3d 165, 170 (S.D.N.Y. 2015) (quoting *Katz* v. *United States*, 389
U.S. 347, 357 (1967)).

One such exception is the search-incident-to-arrest doctrine.  *United
States* v. *Robinson*, 414 U.S. 218, 225 (1973).  Under that doctrine, police
officers may search a person in connection with a lawful arrest.  *Sullivan* v. *City
of New York*, No. 17 Civ. 3779 (KPF), 2018 WL 3368706, at *9 (S.D.N.Y.
July 10, 2018).  Put differently, "where police officers have probable cause to

effect a[n] arrest, they may search the suspect without a warrant incident to
that arrest." *United States* v. *Herron*, 18 F. Supp. 3d 214, 223 (E.D.N.Y. 2014)
(citing *Robinson*, 414 U.S. at 235).  The doctrine both "protect[s] arresting
officers and safeguard[s] any evidence of the offense of arrest that an arrestee
might conceal or destroy." *Arizona* v. *Gant*, 556 U.S. 332, 339 (2009).
"However, the scope of a search incident to arrest is limited." *Sloley* v.
*VanBramer*, 945 F.3d 30 (2d Cir. 2019).  To determine whether a given search
incident to arrest is reasonable, courts consider both "the degree to which [it]
intrudes upon an individual's privacy" and "the degree to which [it is] needed
for the promotion of legitimate governmental interests." *Birchfield* v. *North
Dakota*, 579 U.S. 438, 460-61 (2016) (internal quotation marks omitted).

### b.    Analysis

Plaintiff alleges that he was subject to three unconstitutional searches:
(i) a pat-down search by Defendants Payano and Garcia inside 64 Essex at the
time of his arrest; (ii) a search by Defendant Brown outside of the prisoner van
before he was transported to PSA 4; and (iii) a manual cavity inspection by
Brown at PSA 4.  (Pl. Opp. 18).  Defendants maintain that the first two
searches were lawful and deny that the cavity search occurred.  (Def. Br. 13-
16).  As explained herein, disputes of material fact preclude summary
judgment as to all three of the searches.

### i.    The Searches In and Around 64 Essex

The Court begins with the searches that occurred in 64 Essex and at the
prisoner van.  Both were pat-down searches, and neither yielded any

contraband.  (Pl. 56.1 ¶¶ 45-46, 50).  The parties agree that both of these warrantless searches would be lawful searches incident to arrest *if* Defendants had probable cause to arrest Plaintiff in the first place.  (Def. Br. 15 & n.5; Pl. Opp. 18).  Indeed, a lawful custodial arrest permits a police officer to search "the arrestee's person and the area within his immediate control.'"  *Gant*, 556 U.S. at 339; *see also United States* v. *Diaz*, 854 F.3d 197, 209 (2d Cir. 2017) ("[A]n officer … who has probable cause to believe that a person has committed a crime … may lawfully search that person pursuant to the search-incident-to-arrest doctrine.").  But as explained previously, whether the officers had probable cause to arrest Plaintiff — and thus whether his arrest and custody were lawful — are disputed facts.  *See supra* Section B.1.  Until a jury resolves that threshold issue, the Court cannot rule on this conditional one.

### ii.    The Manual Cavity Search at PSA 4

Plaintiff next challenges a search that took place at PSA 4.  He claims that upon his arrival, Brown interrogated him about where on his person he had hidden drugs.  (Pl. Decl. ¶ 4).  Plaintiff further claims that when he told Brown that he did not have any drugs on his person, Brown became angry, forced Plaintiff to the ground, pulled down his pants, touched his genitals, and inserted one or two gloved fingers into his anus while other officers held Plaintiff down in a search that did not yield any drugs or contraband of any kind.  (Pl. 56.1 ¶¶ 51-57; *see also* Pl. Decl. ¶¶ 4-7; Pl. Dep. 85-89).

Strip searches (and, by extension, cavity searches) are "uniquely intrusive" and thus are tolerated by the Fourth Amendment in only the rarest

34

of circumstances.  *Hartline* v. *Gallo*, 546 F.3d 95, 102 (2d Cir. 2008).  Indeed, it is hard to imagine a stronger privacy interest than one's interest in being free from such a search.  Strip searches "occasion[] a serious invasion of privacy and work[] a significant harm to a person's bodily integrity."  *Sloley*, 945 F.3d at 38.  And the government's interest in strip searches is slight, particularly in light of "the multitude of less invasive investigative techniques available to officers."  *Hartline*, 546 F.3d at 102.  As such, "a visual body cavity search conducted as an incident to a lawful arrest for any offense must be supported by 'a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity.'"  *Sloley*, 945 F.3d at 38 (quoting *People* v. *Hall*, 10 N.Y.3d 303, 311 (2008)).

Manual body cavity searches, in which an officer inserts or removes something from inside an arrestee's body, are subject to even more exacting constitutional scrutiny.  *See Gonzalez* v. *City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013); *see also Harris* v. *Miller*, 818 F.3d 49, 58 (2d Cir. 2016) (defining manual cavity searches as involving "some degree of touching or probing of body cavities").  Because of their intrusiveness, police searches within the body "require a special heightened standard."  *Monroe* v. *Gould,* 372 F. Supp. 3d 197, 205 (S.D.N.Y. 2019); *see also Schmerber* v. *California*, 384 U.S. 757, 770 (1966) (noting that "intrusions beyond the body's surface are forbidden by the Fourth Amendment in the absence of clear indication that the evidence will be found"); *Hall*, 10 N.Y.3d at 309 ("Because a manual cavity search is more intrusive and gives rise to heightened privacy and health

35

concerns, when weighed against the legitimate needs of law enforcement, we believe it should be subject to a stricter legal standard."). This heightened standard can be met, for instance, when contraband is visibly protruding from an arrestee's body. *See, e.g.*, *Gonzalez*, 728 F.3d at 162 n.7 (determining that the Fourth Amendment allowed cavity search when officers observed a bag of drugs protruding from suspect's anus). To be clear, "being arrested for a narcotics offense does not *automatically* give rise to a reasonable suspicion to justify a strip search and visual cavity inspection," and certainly does not justify a manual cavity inspection. *Rodriguez* v. *City of New York*, No. 15 Civ. 1055 (CM), 2016 WL 6084078, at *11 (S.D.N.Y. Oct. 12, 2016) (emphasis in original).

Defendants do not attempt to argue that a manual cavity search was justified on the facts. Instead, they maintain that no such search ever occurred. (Def. Br. 15-16). Specifically, Defendants point to an arrest report and a precinct command log, neither of which notates a strip search, as well as officer testimony stating that the command log would have noted a search had it occurred. (*Id.* (citing, *inter alia*, Spears Decl., Ex. H (arrest report); *id.*, Ex. K (command log)). They argue that given this evidence, Plaintiff's self-serving deposition testimony, standing alone, is insufficient to create a triable issue of fact as to whether he was subjected to a cavity search at PSA 4. (*Id.* at 15).

Defendants cite two cases for the latter proposition: *Deebs* v. *ALSTOM Transportation, Inc.*, 346 F. App'x 654 (2d Cir. 2009) (summary order), and *TufAmerica, Inc.* v. *Codigo Music LLC*, 162 F. Supp. 3d 295 (S.D.N.Y. 2016).

36

(Def. Br. 15-16).  In *Deebs*, the Second Circuit affirmed an order granting summary judgment to a defendant-employer in an age discrimination case. 346 F. App'x at 655-57.  In so holding, it found that the plaintiff's "vague assertion" that younger employees were hired at or about the time of his termination could not create a triable issue of fact in light of the employer's unrebutted evidence that its downsizing preserved the jobs of a considerable number of older employees and eliminated the jobs of several younger ones.  *Id.* at 657.  The Court noted the "purely conclusory" nature of the plaintiff's allegations and the lack of "any concrete particulars" in his testimony.  *Id.* at 656.  *TufAmerica* is similar.  There, a district court found that testimony that a deponent did not sign certain agreements did not create an issue of fact "where no parties argue that the contracts did not contain both [the deponent]'s signature and clear, unambiguous terms."  *TufAmerica*, 162 F. Supp. 3d at 324.

Both *Deebs* and *TufAmerica* are readily distinguishable.  Unlike the deponents in those cases, Plaintiff provided a detailed account of his experience in both his deposition and a later declaration.  (*See, e.g.*, Pl. Decl. ¶ 6 ("I was then forcibly held down by NYPD officers while Officer Brown conducted an invasive body search of me which included … touching and searching around my genitalia and inserting one or two fingers back and forth inside my anus."); Pl. Dep. 87 ("He took his gloves and — he went in my ass crack, he took his fingers, went with — checked inside, to see if I stuck anything in there.  He

lifted my nuts up, looked under there.")).  These statements are far more

detailed than the conclusory statements at issue in the cases Defendants cite.

    And unlike in *Deebs* and *TufAmerica*, Plaintiff's testimony is reconcilable

with the documentary evidence.  To be sure, the Court agrees with Defendants'

characterization of that evidence; the arrest report unambiguously states that

Plaintiff was not strip-searched (Spears Decl., Ex. H), and the command log

lacks a strip search notation (*id.*, Ex. K).  But unlike the cases on which

Defendants rely, there is an obvious way to square Plaintiff's recollection of

events with that evidence.  It is certainly possible that had the officers

conducted a cavity search they knew to be unlawful, they would not have

created records of the deed.  Considered that way, the documents offered by

Brown can also be considered self-serving.  The Court certainly hopes that the

officers involved would do no such thing.  But in this procedural posture, it

cannot take their word for it.  A jury must decide whose version of events to

credit.

    Given these glaring differences between the instant case and the cases

Defendants cite, the Court is unwilling to stray from the usual rule that it must

credit the non-moving party's version of disputed facts.  Instead, the Court

follows more factually analogous cases in deeming what happened to Plaintiff

at PSA 4 to be a triable issue of fact.  *See, e.g.*, *Williams*, 2007 WL 2214390, at

*12 (crediting, for purpose of summary judgment motion, plaintiff's testimony

that he was strip-searched at a midtown Manhattan precinct).  In sum,

Plaintiff's search claims survive summary judgment as to the officers who were

personally involved in each contested search: Defendants Payano and Garcia
for the search at 64 Essex, and Defendant Brown for the searches at the van
and inside PSA 4.  *See Victory*, 814 F.3d at 67.

> **5.    The Court Denies Summary Judgment on Plaintiff's Claim of Excessive Force as to Defendants Payano and Garcia**
>
> **a.    Applicable Law**

"Claims that law enforcement officers have used excessive force ... should
be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]"
*Graham* v. *Connor*, 490 U.S. 386, 395 (1989).  A use of force violates the Fourth
Amendment if the police officer's conduct is "objectively unreasonable 'in light
of the facts and circumstances confronting them, without regard to their
underlying intent or motivation.'" *Cruz* v. *City of New York*, 232 F. Supp. 3d
438, 451 (S.D.N.Y. 2017) (quoting *Maxwell* v. *City of New York*, 380 F.3d 106,
108 (2d Cir. 2004) (internal quotation omitted)); *accord Mickle* v. *Morin*, 297
F.3d 114, 120 (2d Cir. 2002).

Courts analyze excessive force claims "from the perspective of a
reasonable officer on the scene, rather than with the 20/20 vision of
hindsight," and must make "allowance for the fact that police officers are often
forced to make split-second judgments — in circumstances that are tense,
uncertain, and rapidly evolving — about the amount of force that is necessary
in a particular situation." *Graham*, 490 U.S. at 396-97  The analysis involves
"a careful balancing of the nature and quality of the intrusion on the
individual's Fourth Amendment interests against the countervailing
government interests at stake." *Figueroa*, 825 F.3d at 105 (quoting *Graham*,

490 U.S. at 396 (internal quotation marks omitted)).  To aid in this inquiry, courts consider, among other things, "[i] the nature and severity of the crime leading to the arrest, [ii] whether the suspect pose[d] an immediate threat to the safety of the officer or others, and [iii] whether the suspect was actively resisting arrest or attempting to evade arrest by flight."  *See Tracy* v. *Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham*, 490 U.S. at 396).

"The extent of injury may also provide some indication of the amount of force applied."  *Wilkins* v. *Gaddy*, 559 U.S. 34, 37 (2010) (per curiam).  "Courts in this district have routinely dismissed excessive force claims where the plaintiff alleged that he was thrown to the ground, but did not allege any physical injuries."  *Higginbotham* v. *City of New York*, 105 F. Supp. 3d 369, 376 (S.D.N.Y. 2015) (collecting cases).  Indeed, "[s]ome degree of injury is ordinarily required to state a claim of excessive force[.]"  *Taylor* v. *N.Y. Dep't of Corr.*, No. 10 Civ. 3819 (JPO), 2012 WL 2469856, at *4 (S.D.N.Y. June 27, 2012) (brackets, internal quotation marks, and citation omitted).  To be sure, a plaintiff "need not prove 'significant injury' to make out an excessive force claim[.]"  *Griffin* v. *Crippen*, 193 F.3d 89, 92 (2d Cir. 1999).  But "a *de minimis* use of force will rarely suffice to state a constitutional claim."  *Romano* v. *Howarth*, 998 F.2d 101, 105 (2d Cir. 1993); *see also Boddie* v. *Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (concluding that allegation that plaintiff was "bumped, grabbed, elbowed, and pushed" did not rise to a level of constitutional significance because the plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact").

An officer is only entitled to summary judgment on an excessive force claim if "no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am.* v. *Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (citing *O'Bert* v. *Vargo*, 331 F.3d 29, 37 (2d Cir. 2003)). Put somewhat differently, the evidence must demonstrate that "no rational jury could have found that the force used was so excessive that no reasonable officer would have made the same choice." *Lennon* v. *Miller*, 66 F.3d 416, 426 (2d Cir. 1995).

### b.    Analysis

Defendants Payano and Garcia assert that the force they used in grabbing, struggling with, and handcuffing Plaintiff is constitutionally justified in light of Plaintiff's minute-long struggle to avoid apprehension. (Def. Br. 17-18). They further argue that the Court should discredit Plaintiff's claim that an officer kicked him in the face after he was handcuffed because such claim is belied by Plaintiff's own medical records. (*Id.* at 18). Plaintiff responds that even grabbing him was excessive because his arrest was unlawful, and offers a photograph that he took of himself the day after his arrest to support his contention that an officer kicked him and thereby caused him to suffer "a busted lip and loose tooth." (Pl. 56.1 ¶ 43; *see also* Sivin Decl., Ex. 4 (photograph)). In reply, the officers object that Plaintiff's photograph does not actually depict the injuries he describes. (Def. Reply 3).

Both parties overstate their positions. To begin, the Court rejects Plaintiff's contention that *any* amount of force is excessive in the context of an

41

unlawful arrest.  "Because the excessive force and false arrest inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim." *Cnty. of Los Angeles* v. *Mendez*, 581 U.S. 420, 429-30 (2017) (quoting *Beier* v. *Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004)); *see also Goonewardena* v. *Spinelli*, No. 15 Civ. 5239 (MKB) (ST), 2017 WL 4280549, at *11 (E.D.N.Y. Sept. 26, 2017) ("Under federal law, when an officer arrests someone without probable cause, the unlawful arrest does not automatically give rise to an excessive force claim").  Instead, reasonableness remains the touchstone of the excessive force analysis.  *Jones* v. *Parmley*, 465 F.3d 46, 62 (2d Cir. 2006) ("[T]he reasonableness test ... remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest.").

Conversely, Defendants are wrong to imply that Plaintiff's failure to seek medical treatment for his lip and tooth following the alleged kick entitles them to a ruling as a matter of law.  It is true that the hospital records state that Plaintiff was brought to the hospital "after . . . he complained of shoulder pain incurred at the time of arrest," and does not mention lip or tooth pain.  (Spears Decl., Ex. O).  But that does not definitively rule out that he was kicked; Plaintiff insists that he was (*see* Pl. Dep. 143), and a jury could find him credible and that his photograph supports that narrative.  And in any event, "a plaintiff need not have sought medical attention to support an excessive force claim."  *Schlaepfer* v. *City of New York*, No. 20 Civ. 3339 (KPF), 2022 WL 4484571, at *15 (S.D.N.Y. Sept. 27, 2023); *see also Hodge* v. *Vill. of*

*Southampton*, 838 F. Supp. 2d 67, 77 (E.D.N.Y. 2012) ("The fact that plaintiff did not require substantial medical treatment at the hospital following the incident does not necessarily mean that [defendant] is entitled to summary judgment.").

A jury could share Defendants' skepticism about Plaintiff's failure to seek medical attention for the full extent of his purported injuries, conclude that he was never kicked, and find that the force used in arresting Plaintiff was proportionate to the circumstances. But if it instead credits Plaintiff's testimony that an officer kicked him in the face after he was handcuffed and had stopped struggling with the officers, Plaintiff could succeed on his excessive force claim. *See Pierre-Antoine* v. *City of New York,* No. 04 Civ. 6987 (GEL), 2006 WL 1292076, at *8 (S.D.N.Y. May 9, 2006) (holding that a reasonable officer would have known that repeatedly punching, kicking and stomping a subdued individual violated the clearly established constitutional right not to be subjected to excessive force during arrest); *see also Ostroski* v. *Town of Southhold,* 443 F. Supp. 2d 325, 343 (E.D.N.Y. July 21, 2006) ("[A] reasonable officer should have known that repeatedly striking a subdued suspect violates a clearly established constitutional right not to be subjected to excessive force during arrest."). The Court cannot resolve Plaintiff's excessive force claim as a matter of law.

6.     **The Court Grants in Part Defendants' Motion for Partial Summary Judgment on Plaintiff's Failure-to-Intervene Claim**

a.     **Applicable Law**

Law enforcement officers have a duty to intervene to prevent their fellow officers from infringing on a citizen's constitutional rights.  *Sloley*, 945 F.3d at 46-47; *see also Anderson* v. *Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.").  Accordingly, an officer can be liable under Section 1983 where "[i] the officer had a realistic opportunity to intervene and prevent the harm; [ii] a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and [iii] the officer does not take reasonable steps to intervene." *Guerrero* v. *City of New York*, No. 16 Civ. 516 (JPO), 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017) (internal quotation omitted).

"Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, 'considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" *Terebesi* v. *Torreso*, 764 F.3d 217, 244 (2d Cir. 2014) (quoting *Branen*, 17 F.3d at 557).  "Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality." *Figueroa*, 825 F.3d at 106 (quoting *O'Neill* v. *Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988)).  "In each case, the question whether a defendant had a realistic chance to intercede will turn on such factors as the number of

44

officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations." *Id.* at 107.

Of potential note, a failure-to-intervene claim cannot lie against an officer who directly participated in the allegedly unlawful conduct. *See Case* v. *City of New York*, 233 F. Supp. 3d 372, 402 (S.D.N.Y. 2017) ("[A] defendant 'cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop [himself] from committing that violation.'" (quoting *Marom* v. *City of New York*, No. 15 Civ. 2017 (PKC), 2016 WL 916424, at *19 (S.D.N.Y. Mar. 7, 2016))); *see also Sanabria* v. *Tezlof*, No. 11 Civ. 6578 (NSR), 2016 WL 4371750, at *5 (S.D.N.Y. Aug. 12, 2016).

### b. Analysis

The parties agree that summary judgment is proper as to the following defendants on the following claims due to their lack of personal involvement in the relevant events: (i) Brown on the false arrest and malicious prosecution claims and in connection with the search at 64 Essex; (ii) UC 376, Crevatas, and Brown on the excessive force claim; and (iii) UC 376, Crevatas, Payano, and Garcia in connection with the cavity search at PSA 4. (Def. Br. 19-20; Pl. Opp. 21-22). The uncontested facts accord with the parties' agreement: Those officers had no opportunity to intervene in the constitutional violations for which they were not present. Accordingly, the Court grants summary judgment to those defendants on those claims.

Defendants assert that they are entitled to summary judgment on the remaining claims because there were no underlying constitutional violations for

them to prevent.  (Def. Br. 19).  Not so.  As explained throughout this Opinion, a jury could find at least some of the defendants liable for false arrest, malicious prosecution, unlawful search, denial of the right to a fair trial, and excessive force.  That jury will also decide whether those officers — specifically, Crevatas, Payano, Garcia, and UC 376 on the false arrest and denial of fair trial claims; Crevatas, Payano, and Garcia on the malicious prosecution claim; Payano and Garcia on the Essex search claim and Brown on the van and PSA 4 search claim; and Payano and Garcia on the excessive force claim — had a reasonable opportunity to intervene to prevent their fellow officers' alleged unconstitutional acts.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Several claims remain: (i) the false arrest claim against UC 376, Crevatas, Payano, and Garcia; (ii) the malicious prosecution claim against UC 376, Crevatas, Payano, and Garcia; (iii) the denial of the right to a fair trial claim against UC 367, Crevatas, Payano, and Garcia; (iv) the unlawful search claims against Payano and Garcia for the search inside 64 Essex and against Brown for the searches at the prison van and inside PSA 4; (v) the excessive force claim against Payano and Garcia; and (vi) the failure to intervene claim against the officers present for each claimed violation.  Defendants are entitled to summary judgment on all other claims, which include the false arrest, malicious prosecution, and Essex search claims against Brown; the excessive force claim against UC 376, Crevatas, and Brown;

and the PSA 4 search claim against UC 367, Crevatas, Payano, and Garcia. The Clerk of Court is directed to terminate the motion at docket entry 107.

The parties are hereby ORDERED to appear for a conference in Courtroom 618 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York, 10007 on **August 1, 2023**, at 11:00 a.m. to set a trial in this matter.

SO ORDERED.

Dated:     July 6, 2023
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge